

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-26-2006

# Hill v. Kutztown

Precedential or Non-Precedential: Precedential

Docket No. 05-1356

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Hill v. Kutztown" (2006). *2006 Decisions.* Paper 646.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/646

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-1356
_____

KEITH A. HILL,

Appellant

v.

BOROUGH OF KUTZTOWN
and GENNARO MARINO,
MAYOR OF KUTZTOWN,
in his individual and official capacity
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(04-cv-03390)
District Judge: Honorable Robert F. Kelly, Sr.

Argued May 15, 2006
Before: MCKEE and GARTH, *Circuit Judges*, and
LIFLAND, *District Judge**

---

* The Honorable John C. Lifland, Senior District Judge
for the District of New Jersey, sitting by designation.

1

(Filed: July 26, 2006)

William P. Murphy, Esq. (ARGUED)
Murphy & Goldstein, P.C.
1616 Walnut Street, Suite 2000
Philadelphia, PA 19103

*Counsel for Appellant*

Timothy T. Myers, Esq. (ARGUED)
Raymond J. Santarelli, Esq.
John G. Dean, Esq.
Elliott Greenleaf & Siedzikowski, P.C.
Union Meeting Corporate Center V
925 Harvest Drive
Blue Bell, PA 19422

Paul J. Dellasega, Esq.
Thomas, Thomas & Hafer
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

*Counsel for Appellee Gennaro Marino*, *Mayor of Kutztown*

Robyn F. McGrath, Esq. (ARGUED)
Sweeney & Sheehan, P.C.
1515 Market Street, 19th Floor
Philadelphia, PA 19102

Michael T. Sellers, Esq.
Kardos, Rickles, Sellers & Hand
626 South State Street
Newtown, PA 18940

*Counsel for Appellee Borough of Kutztown*


_____

OPINION OF THE COURT

_____

GARTH, *Circuit Judge*.


On this appeal we review whether the District Court erred when it dismissed Keith A. Hill's complaint charging Gennaro Marino (the former Mayor of the Borough of Kutztown), and the Borough itself, with violating his rights under the United States Constitution, federal and state statutes, and the common law of Pennsylvania. The District Court dismissed Hill's 6-count complaint in its entirety. We will affirm in part, and reverse in part.

I.

Appellant Hill, a licensed professional engineer, was appointed Borough Manager of Kutztown in early 1991. ¶¶4, 7.[1] In this capacity, he reported to the Borough Council (which consisted of six elected members) and, "in respect to some subjects," to Gennaro Marino, the elected Mayor of the Borough. As Borough Manager, Hill was responsible for the administration of all departments within the Borough. ¶¶10-11.

In short, Hill's complaint alleges that Mayor Marino harassed him and other Borough employees. When he reported the Mayor's harassment to the Borough Council, the Mayor intensified his attacks on Hill as retaliation for this reporting (and for positions Hill took that were contrary to the Mayor's positions). As a result of the Mayor's conduct, Hill's workplace became so intolerable that he had no choice but to resign.[2]

More specifically, the complaint alleges as follows:

---

[1] All paragraph citations in this opinion refer to the complaint.

[2] Hill's employment was the responsibility of the Borough Council. He could only be appointed and fired by the Borough Council. 53 PA. CONS. STAT. §46141.

4

Shortly after he took office in 2002, Mayor Marino "began orally to spread the word that he intended to get rid of" Hill and "other high-priced senior staff employees." ¶19. The Borough Council became aware of, and disapproved of, the things Marino was saying. Borough Council President Eric Ely wrote a letter to a local newspaper, *The Patriot*, that appeared in April, 2002 and stated:

> Another way Mr. Marino has hurt the borough is in the manner in which he has conducted himself in the bars, clubs and community with talk smearing the reputation of good people. He has made many statements in those places of how he is going to get rid of certain council members and plans to have this or that borough employee replaced . . . His statements concerning these individuals are hurting the borough because they . . . are based on false opinions . . . [T]hose statements are hurting the good reputation of our hard-working employees.

¶23.

Marino's conduct and behavior nevertheless continued. He told the Chief of Police that he "would make life difficult for him as a means to get him to resign as chief." ¶37. Further, he behaved in a hostile and intimidating manner toward several other Borough employees, each of whom approached Hill and told him about this treatment at the hands

5

of the Mayor. ¶¶24-27, 30-35.

In addition to his threats to "get rid of" – and his hostile treatment of – Borough employees, Mayor Marino also made several false accusations against Hill. At a meeting of the Borough Council on April 23, 2002, Mayor Marino "demanded [Hill's] resignation, purportedly because of his involvement in certain appointments by [the] Council which the Mayor described as a 'plot' that was corrupt and criminal." ¶22. Mayor Marino also told Borough employee Frank Caruso that Hill was "illegally moving funds to confuse everyone." ¶28.

"[A]s part of his duties as Manager," Hill reported Mayor Marino's conduct towards him and towards the other Borough employees to the Borough Council. ¶36.

Apparently at the same time that all of the above was occurring, Mayor Marino began "to attack the Borough's telecommunications project," with which Hill was identified, and which had traditionally enjoyed the support of the Borough Council. The Mayor "made clear his utter distaste" for the project. In response, Hill "advocated for [the project's] continuation." ¶¶39-41.

As retaliation (1) for Hill's reporting the Mayor's conduct to the Borough Council, (2) for Hill's advocacy in support of the telecommunications project, and (3) for Hill's

6

support of other unspecified positions that were associated with the previous mayor, Mayor Marino continued his persecution of Hill. ¶¶43, 110. Specifically, the Mayor engaged in a series of "harassing, intimidating and oppressive confrontations with [Hill] at his workplace and at Council meetings," and defamed Hill to Borough employees, and to consultants present at Hill's workplace, and to the public. ¶44.

Hill sent a number of letters to the Borough Solicitor and had multiple conversations with the Personnel Committee of the Borough Council, asking each to "remedy the course of conduct by Defendant Marino." ¶45. In July 2002, Hill made oral complaints to the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC"). He subsequently filed a written complaint with the PHRC. ¶¶48-49.

The Mayor's conduct nevertheless persisted. On August 22, 2002, Mayor Marino published a "newspaper commentary" in which he accused Hill of "irregular or illegal" allocations of funds, and of "recklessly handling our money." ¶50. This accusation was false. The Borough of Kutztown actually possessed a AAA credit rating. Moreover, a bond attorney, a bond underwriter and Borough auditors had verified the Borough's solid financial condition and its efficient management. ¶51.

Prior to Mayor Marino's public attacks on him, Hill had enjoyed a reputation for honesty, integrity and professionalism. ¶52. After Marino's attacks, Hill was "subjected to scorn and ridicule," including one incident where Hill's son's employer confronted Hill and Hill's wife and told them that he, the employer, had heard the Mayor "was pursuing [Hill] concerning corruption." ¶54.

The Mayor's conduct, and the Borough Council's failure to stop it, made life so intolerable for Hill that he eventually had no choice but to resign. ¶55.[3] Hill submitted a letter of resignation on August 29, 2002, which stated that he would cease work on October 12, 2002. ¶57.[4]

The Borough Council continued to be upset about

---

[3]  The Mayor apparently acknowledged the connection between the Mayor's conduct and Hill's resignation. At a September 17, 2002 meeting of the Borough Council, Mayor Marino stated that he deserved "credit" for Hill's departure. ¶62.

[4] Hill's brief makes reference to an August 2004 report that the Borough Council commissioned a Special Counsel to write. The report apparently corroborates and adds further detail to Hill's allegations about the way Mayor Marino behaved toward him.

Mayor Marino's conduct, and the effect it was having.[5]  It asked Hill to reconsider and stay on as Borough Manager. Hill refused, but did agree to postpone his departure until October 27, 2002.  ¶¶66-67.

Hill then accepted a position with "the engineering consulting firm that had for years served in the role of Borough engineer."  The Borough Council (by unanimous vote) initiated and worked out a part-time emergency "consulting" arrangement with that firm so that Hill could be made available to assist with certain urgent Borough tasks, such as budget preparation, in the period of transition to the new Manager.  ¶¶68-73.  Hill worked in this capacity, without receiving any additional salary for it, until January 2003, when the Borough hired a replacement.  ¶¶74-76.  The replacement was twenty-seven years old, ¶76, some fifteen or sixteen years younger than Hill, who was over 40 years of age when he left the Borough's employ.  ¶4.[6]

---

[5] Two newspaper articles from September 2002 report Council President Ely as saying that "the false accusations made (by Marino) are detrimental to residents and the borough as a whole," and "[f]or the council the biggest thing is the misinformation given out by [Mayor Marino] . . . It's hard to deal with.  I've been on (council) for 27 years and I've never seen anything like it."  ¶¶63-64.

[6] The complaint alleges that Marino continued to harass and defame Hill even after he had ceased to be Borough

Hill brought this lawsuit against Mayor Marino (in his individual and official capacities) and the Borough of Kutztown.  The complaint alleged that the Mayor's campaign of harassment, defamation and retaliation deprived Hill of his job (through constructive discharge[7]), and did damage to his

Manager.  It alleges that the Mayor filed complaints with two state agencies based on Hill's transitional service to the Borough, and wrote letters to various governmental agencies and officials – as well as private individuals and media organizations – in which he implied that Hill had mishandled funds.  These allegations are irrelevant to this appeal – which is based on claims arising out of Hill's constructive discharge – as they detail events that occurred *after* the constructive discharge.

[7] "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004) (discussing constructive discharge in the context of a Title VII sexual harassment suit). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id.*
The District Court did not address the question of whether Hill has alleged conditions so intolerable that a reasonable person in his position would have felt compelled to resign, i.e., whether he, in fact, *was* constructively discharged. It would have been inappropriate for the District Court to decide that fact-intensive question in the context of a 12(b)(6) motion.

reputation and his ability to earn a living as a licensed professional engineer and a public servant  *See, e.g.,* ¶¶14, 58, 106.  He further alleged that the Borough Council "did not halt, reverse or lessen or otherwise materially affect the alleged offending conduct of the Mayor."  *See, e.g.,* ¶16.

Hill's complaint asserted §1983[8] claims against both the Mayor and the Borough for violation of his (1) procedural due process rights, (2) substantive due process rights, (3) equal protection rights and (4) First Amendment rights under the U.S. Constitution.  The complaint also asserted against the Borough (5) a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.*, and state law claims for (6) violation of the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. §951, *et seq.* and (7) indemnification and restitution. Finally, the complaint

---

Thus, for the purpose of this opinion, we credit all allegations of Hill's complaint and accept what Hill alleges: that he was constructively discharged.

[8] "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).  *See* 42 U.S.C. §1983.  Mayor Marino does not dispute that he was acting under color of state law when he engaged in the conduct at issue here.

11

asserted against the Mayor a (8) state law malicious prosecution claim.

Pursuant to Rule 12(b)(6), the District Court dismissed all of the federal claims against both the Mayor and the Borough, and the PHRA claim against the Borough. It then declined to exercise jurisdiction over the remaining pendent state common law claims.

## II.

The District Court exercised jurisdiction pursuant to 28 U.S.C. §§1331, 1343 and 1367. We have jurisdiction pursuant to 28 U.S.C. §1291.

Our review of the District Court's dismissal of the complaint is plenary. "When considering an appeal from a dismissal of a complaint pursuant to Rule 12(b)(6), we accept as true all well-pled factual allegations. We examine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Delaware Nation v. Pennsylvania*, 446 F.3d 410, 415 (3d Cir. 2006) (citations omitted).

## III.

### A.

We first address Hill's §1983 claims against Mayor

12

Marino,[9] and Marino's immunity defenses.

### 1. Procedural Due Process Claims[10]

---

[9] Hill brings claims against Mayor Marino "in his individual and official capacity." Section IIIA of this opinion addresses the §1983 individual capacity claims against Marino. The §1983 official capacity claims against Marino are, effectively, identical to the §1983 claims against the Borough, which are addressed in Section IIIB(1) of this opinion. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent") (quotation and citation omitted); *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 581 (3d Cir. 2004) ("A suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself.").

[10] We have held that a resignation will be deemed involuntary (i.e., deemed a constructive discharge) and will thus trigger the protections of the due process clause, and form the basis of a §1983 due process claim, under only two circumstances: (1) when the employer forces the employee's resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee. *Leheny v. City of Pittsburgh*, 183 F.3d 220, 228 (3d Cir. 1999). At least one other court that applied this *Leheny* standard has recently held that the less strict constructive discharge standard the Supreme

To state a claim under §1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

Hill advances two procedural due process claims. ¶¶100-106, 114-120. He first raises a classic *property-based* procedural due process claim, arguing that when Mayor Marino constructively discharged him, he was deprived of his right to continued employment without due process. He then raises a so-called "stigma-plus" claim, arguing that when Marino defamed him in the course of discharging him, he was deprived of his *liberty interest* in his reputation "without opportunity for any meaningful procedure." ¶105, 119.

### a. Property Interest

The District Court properly concluded that Hill failed to state a claim for deprivation of his right to retain his job without due process because Hill's interest in retaining his job

Court articulated in *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004), *see* footnote 7, is now "equally applicable" in the context of a due process claim, *see Levenstein v. Salafsky*, 414 F.3d 767, 774 (7th Cir. 2005).

14

was not "encompassed within the Fourteenth Amendment's protection of property." "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Whether a person has a legitimate entitlement to – and hence a property interest in – his government job is a question answered by state law. *Id.*

Pursuant to Pennsylvania law, Hill was an at-will employee.[11] "The decisional law is clear that an at-will

---

[11] 53 PA. CONS. STAT. §46141 states:

The council of any borough may, at its discretion, at any time, create by ordinance the office of borough manager and may in like manner abolish the same. While said office exists, the council shall, from time to time, and whenever there is a vacancy, elect, by a vote of a majority of all the members, one person to fill said office, subject to removal by the council at any time by a vote of the majority of all the members.

We note that the Borough of Kutztown Code also includes a provision that reinforces the Borough Manager's at-will employment status. Section 29-7 of that Code states, in pertinent part,

The Borough Manager (hereinafter referred to as the "Manager") shall be appointed for an indefinite term by a majority of all members of the Council. The Manager shall serve at the pleasure of the Council, and he may be

employee does not have a legitimate entitlement to continued employment because [he] serves solely at the pleasure of [his] employer." *Elmore*, 399 F.3d at 282. Hill thus lacked a property interest in retaining his position as Borough Manager that was "sufficient to trigger due process concerns." *Id.*[12] We therefore need not consider whether the procedures available to him provided due process in order to conclude

removed at any time by a majority vote of all of the members of the Council.

[12] Hill's claim that his *substantive due process* rights were violated when he was constructively discharged, fails for similar reasons. To prevail on a substantive due process claim challenging a state actor's conduct, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139-140 (3d Cir. 2000) (Alito, J.) (quotation marks and citation omitted). Whether a property interest is protected for purposes of *substantive due process* is a question that is not answered by reference to state law. Rather, for a property interest to be protected for purposes of *substantive due process*, it must be "fundamental" under the United States Constitution. *Id.* at 140. This court has held explicitly that public employment is not a fundamental right entitled to substantive due process protection. *Id.* at 142-143.

To the extent Hill's substantive due process claim was based not only on loss of his job, but also on reputational injury that decreased his "ability to earn a living," it also fails. *See Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399-404 (3d Cir. 2000) (defamatory statements that curtail a plaintiff's business opportunities do not suffice to support a substantive due process claim).

16

that the District Court should be affirmed on Hill's claim that he was deprived of employment without due process.

b. Liberty Interest

In his second procedural due process claim, Hill alleges that he suffered harm to his reputation and ability to earn a living in his chosen profession as a result of the defamatory statements Marino made about him in the process of constructively discharging him; he claims Marino's scurrilous and false charges deprived him of a liberty interest protected by the due process clause. The District Court dismissed this claim for this same reason it denied Hill's other procedural due process claim: because Hill lacked a property interest in retaining his job.

Relying on *Satterfield v. Borough of Schylkill Haven*, 12 F.Supp.2d 423, 433-434 (E.D.Pa. 1998), the District Court held that defamation such as that with which Hill charges Marino, does not implicate a liberty interest protected by the due process clause unless it "occurs in the course of or is accompanied by . . . extinguishment of a right or status guaranteed by law or the Constitution." Because Hill lacked a property interest in retaining his job under state law, the District Court held, Hill was not deprived of such a right or status when he was constructively discharged. Accordingly, Hill's due process claim failed.

This court has yet to decide the question of whether a public employee who is defamed in the course of being discharged, fails to state a claim for deprivation of a liberty interest merely because he lacked a property interest in

continued employment that is independently protected by the due process clause. *See Graham v. City of Philadelphia*, 402 F.3d 139, 142 n.2 (3d Cir. 2005) ("we have not yet decided this issue"); *Ersek v. Township of Springfield*, 102 F.3d 79, 83 n.5 (3d Cir. 1997) ("Fortunately, we need not reach this difficult question here.").[13]  Hill's appeal now presents that issue squarely.

The Supreme Court held in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971) that an individual has a protectable interest in reputation. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id*. at 437.

Courts have subsequently clarified, however, that "reputation *alone* is not an interest protected by the Due Process Clause." *Versarge v. Township of Clinton, New Jersey*, 984 F.2d 1359, 1371 (3d Cir. 1993) (citing *Paul v. Davis*, 424 U.S. 693, 701-712 (1976)) (emphasis added).[14]

---

[13] The district court in *Satterfield v. Borough of Schylkill Haven*, itself recognized that.  12 F.Supp.2d 423, 434 (E.D.Pa. 1998) ("the Third Circuit has not decided whether something less than a true property interest, independently protected by the Due Process Clause, can satisfy the requirement of a 'right or status' guaranteed by the Constitution") (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)).

[14] According to the Supreme Court, damage to reputation alone is best vindicated with a state defamation claim. *Paul v. Davis*, 424 U.S. 693, 712 (1976).  We recognize, however, that state law immunity doctrines often prevent such claims from

18

Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest. *Paul v. Davis*, 424 U.S. 693, 701 (1976). *Accord, e.g., Siegert v. Gilley*, 500 U.S. 226, 233-234 (1991); *Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488, 492 (3d Cir. 1998); *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1077-1078 (3d Cir. 1997); *Ersek*, 102 F.3d at 83 n. 5*; Clark v. Township of Falls*, 890 F.2d 611, 619-620 (3d Cir. 1989); *Sturm v. Clark*, 835 F.2d 1009, 1012-1013 (3d Cir. 1987). We have referred to this as the "stigma-plus" test. *See, e.g., Graham*, 402 F.3d at 142 n.2; *Ersek*, 102 F.3d at 83 n.5.

In the public employment context, the "stigma-plus" test has been applied to mean that when an employer "creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest. *Codd v. Velger*, 429 U.S. 624, 628 (1977). The creation and dissemination of a false and defamatory impression is the "stigma," and the termination is the "plus." When such a deprivation occurs, the employee is entitled to a name-clearing hearing.[15]

_____

being brought against government actors. *See, e.g., Lindner v. Mollan*, 677 A.2d 1194, 1195-1196 (Pa. 1996) (doctrine of absolute privilege exempts a high public official from all civil suits for damages arising out of false defamatory statements provided the statements are made in the course of the official's duties or powers and within the scope of his authority).

[15] *Codd v. Velger*, 429 U.S. 624, 627 (1977); *Graham*, 402 F.3d at 144; *Ersek*, 102 F.3d at 84*; Doe v. U.S. Dept. of*

To satisfy the "stigma" prong of the test, it must be alleged that the purportedly stigmatizing statement(s) (1) were made publicly, *Bishop v. Wood*, 426 U.S. 341, 348 (1976); *Chabal v. Reagan*, 841 F.2d 1216, 1223-1224 (3d Cir. 1988); *Anderson v. City of Philadelphia*, 845 F.2d 1216, 1222 (3d Cir.1988), and (2) were false. *Codd*, 429 U.S. at 627-629; *Fraternal Order of Police v. Tucker*, 868 F.2d 74, 82-83 (3d Cir.1989).

Hill has clearly alleged that Marino defamed him by accusing him of wrongdoing. He alleges that the accusations were made publicly – before his colleagues and before the general public (at Borough Council meetings and in newspaper articles). He alleges that the accusations were false, and that they tarnished his reputation and "subjected [him] to scorn and ridicule."[16] His complaint thus adequately

_____

*Justice*, 753 F.2d 1092, 1112-1114 (D.C. Cir. 1986). We have not in the past decided – and do not have occasion to decide here – whether a plaintiff who prevails on a "stigma-plus" claim may be entitled to remedies other than a name-clearing hearing. *See Ersek*, 102 F.3d at 84 n.6.

[16] The Mayor suggests that his statements about which Hill complains could not be sufficiently stigmatizing because they addressed "matters of public concern" (a phrase of art relevant in the First Amendment context), or because they were one public servant's statements about another public servant's performance of his public job. The statements about which Hill complains are not statements of opinion about the issues of the day, however, or standard comments made among politicians in the rough-and-tumble that is local politics. He complains about factual allegations of illegal conduct, that allegedly were false,

20

alleges the "stigma" prong of the "stigma-plus" test.

What is required to satisfy the "plus" prong of the test in the public employment context is more equivocal. The Supreme Court precedent is not crystal clear on whether termination from government employment constitutes a sufficient "plus" when, as a matter of state law, the plaintiff lacked a property interest in retaining his job.

In *Paul v. Davis*, the Court stated, somewhat enigmatically, that the "plus" had to be an alteration or extinguishment of "a right or status previously recognized by state law." 424 U.S. at 711. That Court's treatment of *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972) suggests that, under this standard, a person's loss of employment to which he did not hold a state law-created property interest is a sufficient "plus."

In *Roth*, a non-tenured professor who had not been reappointed after his initial one-year term ended claimed he had been deprived of a right to continued employment without due process. The Court denied his claim, finding that the professor, because he was not tenured, did not have a property right to continued employment. It noted, however, that had the University defamed the professor in the course of declining to rehire him, it would have deprived the professor of a liberty interest. *Id.* at 573. It came to this conclusion

<hr>

see, e.g., ¶28, and that the Mayor allegedly knew were false. *See, e.g.,* ¶51. They are not protected as a matter of law by any exception for "matters of public concern" or "public servant" exception.

21

despite the fact that the professor lacked a property interest in his job. The Court in *Paul v. Davis* – and then in later opinions – impliedly endorsed this conclusion. 424 U.S. at 709-710.[17] *See also Siegert*, 500 U.S. at 233; *Owen v. City of Independence*, 445 U.S. 622, 633 n.13 (1980).

Though it has never again taken this issue on directly, the Court in subsequent opinions has reiterated that the "plus" in "stigma-plus" claims arising out of public employment decisions, may be loss of a job in which the plaintiff held no property interest under state law. In *Owen*, the Eighth Circuit had held that the police chief petitioner "possessed no property interest in continued employment," but that allegedly false accusations the city made incident to his discharge "had blackened petitioner's name and reputation, thus depriving him of liberty without due process of law." 445 U.S. at 631. Citing *Roth* and *Paul v. Davis*, the Supreme Court held that it had "no doubt that the Court of Appeals" was correct in this conclusion. *Id.* at 633 n.13. Similarly, in *Codd v. Velger*, the Court stated that "where a *non-tenured* employee has been stigmatized in the course of a decision to terminate his employment," he is entitled to a name-clearing hearing. 429 U.S. at 627.[18]

---

[17] We previously pointed to this implication of *Paul v. Davis* in *Ersek v. Township of Springfield*, 102 F.3d 79, 83 n.5 (3d Cir. 1997).

[18] In *Codd v. Velger*, the Court denied the claim of the petitioner – a probationary employee who lacked a property interest in his job – not because he was probationary, but because he failed to allege that the information that had been disclosed was false. 429 U.S. at 627-628.

We, too, have never clearly answered the question whether termination from a government job constitutes a sufficient "plus" under the "stigma-plus" test when, as a matter of state law, the plaintiff lacked a property interest in retaining the job. On at least one occasion we have suggested that it might. *See McKnight v. SEPTA*, 583 F.2d 1229, 1235-1242 (3d Cir. 1978) (holding that a complaint stated a "stigma-plus" due process claim where the plaintiff was defamed in the course of being discharged, though *it was not clear* under state law whether he had a property interest in continued employment).

We *have* in several cases used language that could be read broadly to require that the "plus" be loss of a job in which the plaintiff had a protectible property interest. *See Ersek*, 102 F.3d at 83 n.5 (noting this). These cases, however, are all factually distinguishable. In each of them, we held that the deprivation the plaintiff suffered along with stigma to his reputation was not sufficiently weighty to satisfy the "plus" requirement. We so held because the plaintiff did *not* lose his job, and instead complained about some adverse employment action less drastic than discharge. *See Edwards*, 156 F.3d at 492 (plaintiff was suspended with pay, but was not fired); *Kelly*, 107 F.3d at 1077-1078 (plaintiff was reprimanded and disciplined, but was never suspended, removed, fined or reduced in rank); *Clark*, 890 F.2d at 617-620 (plaintiff's duties were changed, but he did not lose his job, and neither his grade nor his pay was lowered); *Robb*, 733 F.2d at 294 (plaintiff was transferred and denied a promotion, but remained employed by the City of Philadelphia at the same classification level and pay scale that he had previously had). *See also Versarge*, 984 F.2d at 1370-1371 (plaintiff lost job as

23

firefighter, but job was only a volunteer position to begin with). Here, however, Hill did lose his job. The "plus," consisting of Hill's constructive discharge was substantial – so substantial, in fact, that we can comfortably hold that Hill has met all requirements of "stigma-plus."

We therefore conclude today that a public employee who is defamed in the course of being terminated or constructively discharged satisfies the "stigma-plus" test even if, as a matter of state law, he lacks a property interest in the job he lost.

We note that other courts have come to this conclusion, mostly based on Supreme Court language in *Paul v. Davis*. *See, e.g., Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1104-1112 (D.C. Cir. 1985); *Dennis v. S&S Consol. Rural High Sch. Dist.*, 577 F.2d 338, 342-343 (5th Cir. 1978); *Colaizzi v. Walker*, 542 F.2d 969, 973 (7th Cir. 1976).

We believe that this conclusion makes good sense, and is logical. To hold otherwise – that a government employee must be deprived of a state law-created property interest in continued employment in order to satisfy the "plus" in a "stigma-plus" claim – would

> equate the interests protected by the *property* clause of the [fourteenth] amendment with those protected by the *liberty* clause . . . [T]he liberty clause would be stripped of *any* independent meaning in the context of government defamation. Government employees who enjoy an independent property interest in continued employment, of course, must be afforded due process

24

upon termination regardless of whether they are discharged in connection with stigmatizing allegations. That process will ordinarily afford those employees an opportunity to refute stigmatizing allegations. The liberty clause, by contrast, protects reputation, not job tenure, in the government employment context. Although *Paul* requires the alteration of some governmentally recognized status in addition to defamation, the *Paul* court plainly declined to equate that additional component with an independent, constitutionally protected property interest.

*Doe*, 753 F.2d at 1108 n.15.

Hill has alleged that Marino's defamation occurred in connection with his discharge. Under our holding today, this is sufficient to satisfy the "plus" prong of the "stigma-plus" test, despite the fact that Hill was an at-will employee and did not have a property interest in continued employment under state law.

Hill has thus alleged deprivation of a liberty interest protectible under the due process clause. Hill was not given the process he was due – a name-clearing hearing.[19] He has consequently stated a claim for deprivation of his liberty interest in his reputation without the process the U.S. constitution requires.

---

[19] It is not clear from the complaint whether Hill requested any sort of name-clearing hearing, but we have not held that he was required to do so. *See Ersek*, 102 F.3d at 84 n.8.

2. Equal Protection Claim

Hill also claims that his rights under the Equal Protection clause were violated when Marino constructively discharged him. ¶103. He invokes the "class of one" theory announced in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). According to that theory, a plaintiff states a claim for violation of the Equal Protection clause when he "alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. The District Court dismissed this claim, and we will affirm, but on a different basis.

Our court has not had the opportunity to consider the equal protection "class of one" theory at any length. From the text of *Olech* itself, however, it is clear that, at the very least, to state a claim under that theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.

Hill's claim must fail because he does not allege the existence of similarly situated individuals – i.e., Borough Managers – who Marino treated differently than he treated Hill. *See, e.g., Levenstein v. Salafsky*, 414 F.3d 767, 776 (7th Cir. 2005) (affirming a grant of judgment for the defendant on the equal protection "class of one" claim of a professor who alleged he had been constructively discharged, because the professor failed to identify another similarly situated individual who had been treated differently). In fact, the only other Borough employees Hill mentions in his complaint were

26

also harassed and threatened by Mayor Marino.  ¶¶25-35.

### 3. First Amendment Claims

Hill alleges that the Mayor's harassment and defamation were retaliation for Hill's speech and political association.  First, Hill alleges, Marino retaliated against him because Hill reported Marino's mistreatment of him and his colleagues to the Borough Council.  In addition, Hill alleges, Marino retaliated against him for advocating and supporting ideas, principles and projects Marino disfavored, including the telecommunications project.  Finally, Hill alleges, the Mayor retaliated against him because he supported the previous mayor's policies and programs.  Hill claims that Marino's retaliation interfered with his First Amendment rights to expression, to association and to petition government for redress of grievances.  ¶110.

### a.

Without citation to any authority, the District Court dismissed this claim on the ground that Marino could not retaliate against, or constructively discharge, Hill because he lacked the power to fire him – a power which, under 53 PA. CONS. STAT. §46141, only the Borough Council possessed. "Hill could not be retaliated [against] by the Mayor for Hill's statements," the District Court held, "because as a matter of Pennsylvania and local law, the Mayor had no authority . . . whatsoever over Hill's employment status."

If it were true that Marino could not constructively discharge Hill because he lacked the power to fire Hill

outright, *all* of Hill's claims against Marino would fail for this reason because they are all premised on Marino's constructive discharge of Hill. However, Marino *could* constructively discharge Hill even though he lacked the statutory authority to fire Hill outright. A supervisor who lacks the power to terminate a subordinate's employment may nonetheless abuse his power with respect to that subordinate, and may even constructively discharge the subordinate, provided he (the supervisor) exercises *some* power over the employee. *Bonenberger v. Plymouth Township*, 132 F.3d 20, 23-25 (3d Cir. 1997).[20]

In *Bonenberger*, a police officer who worked as a dispatcher sued a Sergeant whose repeated sexual harassment of the officer drove her to resign. The Sergeant "had no authority to hire, fire or make any employment decision[s] regarding" the dispatcher, but he did outrank her, and did sometimes supervise her work. *Id.* at 22-23. When the Sergeant supervised the dispatcher's work, he "had sole control over her work environment, determining when she . . . might take a break and which tasks [she] would perform." *Id.* at 22. He "could alter her workload whenever he supervised her shift." *Id.* at 24. If she "failed to follow his orders, the police department would view that failure as insubordination for which [she] properly could begin a disciplinary process that might result in her discharge." *Id.*

---

[20] *See also Wagner v. Devine*, 122 F.3d 53, 55 n.4 (1st Cir. 1997) (defendant city council members had the power to constructively discharge plaintiff police chief though they lacked the power to fire him because they had the power to set his salary, benefits and working conditions).

The District Court (in the context of "color of state law") granted summary judgment for the Sergeant on the ground that he did not have the power to make employment decisions regarding the police officer.[21] This court reversed, noting

> A state employee may, under certain circumstances, wield considerable control over a subordinate whose work he regularly supervises, even if he does not hire, fire, or issue regular evaluations of her work . . . There is simply no plausible justification for distinguishing between abuse of state authority by one who holds the formal title of supervisor, on the one hand, and abuse of state authority by one who bears no such title but whose regular duties nonetheless include a virtually identical supervisory role, on the other . . . [T]he essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state.

*Id.* at 23-24.

---

[21] The court articulated its holding in terms of state power: it held that because the Sergeant lacked sufficient power over the police officer, he could not meet the "color of state law" requirement of §1983. However, its holding was essentially the same as the District Court's holding in this case, even though here the district court articulates its holding in terms of the "authority over employment status." Both district courts found that a plaintiff could not sue a defendant for constructive discharge where the defendant lacked the power to terminate the plaintiff outright.

Hill alleged that he "reported to the Borough Council consisting of six elected Council members (which served as Plaintiff's supervisor) and, in respect to some subjects, to one elected mayor (Defendant Marino) of the Borough of Kutztown." ¶10. He has thus alleged – at least for the purpose of this motion – that Marino wielded sufficient power with respect to Hill, that Marino could constructively discharge Hill, even though only the Borough Council could fire Hill outright.

Pennsylvania statutes are not all that informative about the powers mayors have over employees holding the position of Borough Manager – the position that Hill held.[22] Discovery will reveal whether Marino had sufficient supervisory power over Hill day-to-day, that he could constructively discharge Hill under the authority of *Bonenberger*. For now, Hill's allegations about the manner in

---

[22] The Pennsylvania statute listing the duties of a Borough Mayor states that "it shall be the duty of the mayor . . . to exact a faithful performance of the duties of the officers appointed." 53 PA. CONS. STAT. §46029(1). Pursuant to 53 PA. CONS. STAT. §46142 , "the mayor may delegate to the borough manager any of his nonlegislative and nonjudicial powers and duties," with the approval of the Borough Council. It is the Borough Council – and not the Mayor – however, which sets the Borough Manager's' hours and compensation. 53 PA. CONS. STAT. §46101. But the Mayor works as a member of the Borough Council under certain circumstances. *See, e.g.,* 53 PA. CONS. STAT. §§46007 ("Passage, approval and veto of ordinances") *and* 46003 ("When the mayor may preside over council and vote; [providing for] attendance of mayor at council meetings; breaking tie votes").

which Marino exercised his mayoral powers are more than sufficient to withstand dismissal of Hill's complaint under 12(b)(6). Hence we are satisfied that pursuant to Hill's allegations, which we must credit, Marino had the "power" to constructively discharge Hill.

b.

We turn now to examine whether Hill's allegations are sufficient to establish that his constructive discharge occurred in retaliation for Hill's exercise of his First Amendment rights.

To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. *See, e.g., Phyllis Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).[23] The first factor is a question of law; the second factor is a question of fact. *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004).

i. Hill's Speech

A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the

---

[23] A defendant may defeat the plaintiff's claim by demonstrating that the defendant would have taken the same adverse action in the absence of plaintiff's protected conduct. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made. *Garcetti v. Caballos*, --- U.S. ----, ----, 126 S.Ct. 1951, 1958 (2006). A public employee does not speak "as a citizen" when he makes a statement "pursuant to [his] official duties." *Id.* at 1960. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (quoting *Connick v. Myers*, 461 U.S. 138, 147-148 (1983)).

Hill's complaint states that "[h]aving received complaints from employees [of the Borough] about hostile, intimidating, oppressive and harassing actions by Defendant Marino, Plaintiff *as part of his duties as Manager and otherwise* duly reported them, as well as his own complaints about the same kind of behavior, to Borough Council." ¶36 (emphasis added). In his brief, Hill states that he "relayed his and other workers' complaints [to the Borough Council] in fulfillment of his responsibilities as manager and appointed enforcer of the Borough's Affirmative Action/Equal Employment Opportunity Policy and Program." *Brief* at 3.

Insofar as it is based on this report to the Borough Council, Hill's First Amendment claim must fail because, as Hill himself concedes, he reported Marino's conduct and harassing actions to the Borough Counsel "pursuant to his official duties." Under *Garcetti*, then, he was not speaking "as a citizen" when he made these reports, and, thus, as a

32

matter of law, the reports are not protected speech.[24]

We next consider Hill's First Amendment retaliation claim insofar as it is premised on his advocating and supporting ideas, principles and projects Marino disfavored, including the telecommunications project.

First, the complaint does not indicate that when Hill expressed support for the telecommunications project – as when he complained to the Borough Council – he was speaking pursuant to his official duties, so we read the

_____

[24] Hill appears to allege that his report to the Borough Council could be protected by the First Amendment not only as expressive speech, but also as "petitioning activity." ¶110. When a public employee's activity qualifies as "petitioning the government" – such as filing a grievance pursuant to a collective bargaining agreement, or suing his employer – it is protected activity so long as the petition was not frivolous, or a "sham," regardless of whether the petition involved a matter of public concern. *Brennan v. Norton*, 350 F.3d 399, 417 (3d Cir. 2003); *San Filippo v. Bongiovanni*, 30 F.3d 424, 434-443 (3d Cir. 1994). We have never held, however, that a report of a superior's misconduct to a legislative body when the legislative body is also the reporter's employer constitutes "petitioning activity."

Hill's complaints to the PHRC and the EEOC, ¶¶48-49, might well qualify as "petitioning," and thus would constitute protected activity. *See, e.g., Herr v. Pequea Township*, 274 F.3d 109, 115 (3d Cir. 2001) ("The First Amendment right to petition extends to all departments of government . . . The protection it affords thus applies . . . to petitioning state agencies"). Hill has not, however, alleged that Marino retaliated against him for these complaints. ¶110.

33

complaint to allege that Hill was speaking "as a citizen." *See Delaware Nation*, 446 F.3d at 415 (on a 12(b)(6) motion, the court examines "whether, *under any reasonable reading of the complaint*, the plaintiff may be entitled to relief.") (emphasis added).

Second, we cannot determine in this procedural posture whether the speech involved a matter of public concern.[25] That determination must be made after an examination of "the content, form, and context of [the] statement, as revealed by the whole record." *Rankin*, 483 U.S. at 384.

Nor can we resolve at this stage of this case the question of whether Marino had "an adequate justification for treating the employee differently from any other member of the general public" by restricting his speech. *Garcetti*, 126 S.Ct. at 1958.

Finally, Hill has alleged the requisite causality by claiming that his support for the telecommunications project and other projects and ideas the Mayor opposed, was one of the reasons that Mayor Marino retaliated against him. *See, e.g.,* ¶110, 113.

---

[25] "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Brennan*, 350 F.3d at 412. It seems likely that advocacy and support for ideas, principles and projects a Borough Mayor disfavored would involve a matter of public concern under this standard.

Accordingly, Hill's First Amendment claim, insofar as it is premised on Hill's advocacy and support for ideas, principles and projects Marino disfavored, should not have been dismissed at this stage of the proceeding.

## ii. Hill's political association

Hill also bases his First Amendment retaliation claim on his support for "the policies and programs of the previous mayor." To make out a claim of discrimination based on political association, a public employee must allege (1) that the employee works for a public employer in a position that does not require a political affiliation, (2) that the employee maintained a political affiliation, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision." *Goodman v. Pennsylvania Turnpike Com'n*, 293 F.3d 655, 663-664 (3d Cir. 2002).[26] We need not spend time analyzing this issue because Hill's allegations in his complaint cannot support such a claim.

## 4. Immunity Defenses

The Mayor argues that he is entitled to various kinds of immunities from §1983 liability. Though Hill barely responded to these arguments in his brief, we have examined them ourselves.

---

[26] In our cases in this area, "political affiliation" usually refers to party affiliation, but sometimes refers to affiliation with a particular politician or candidate.

First, we hold that the absolute immunity which shields local officials from liability for their legislative activities, *see Bogan v. Scott-Harris*, 523 U.S. 44 (1998), does not shield Marino because the conduct with which he is charged – constructive discharge through harassment, defamation, and accusations of illegality – was not "legislative activities." *See Youngblood v. DeWeese*, 352 F.3d 836, 839-840 (3d Cir. 2003) (discussing the scope of what constitutes "legislative activities").

We further hold that Marino is not entitled to petitioning immunity under the *Noerr-Pennigton* doctrine because the conduct with which he is charged cannot be construed as "petitioning activity" under any reasonable interpretation of that term. *See A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 252 (3d Cir. 2001) (discussing various kinds of activity that qualifies as "petitioning" for *Noerr-Pennington* purposes).

Moreover, we hold that the doctrine of high official immunity under Pennsylvania law does not shield Marino from suit under §1983. That doctrine shields high officials from state law claims, not constitutional claims.

Finally, we turn to Marino's asserted qualified immunity defense. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

36

(1982)). "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Id.* (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)).

We hold that Marino is not entitled to qualified immunity on Hill's "stigma-plus" due process claim to the extent that claim requests a name-clearing hearing, because the defense of qualified immunity is available only for damages claims – not for claims requesting prospective injunctive relief. *Vance v. Barrett*, 345 F.3d 1083, 1091 n.10 (9th Cir. 2003); *Newman v. Burgin*, 930 F.2d 955, 957 (1st Cir. 1991) (Breyer, J.). *See also Torisky v. Schweiker*, 446 F.3d 438, 448 n.6 (3d Cir. 2006) (stating that if the District Court determined on remand that plaintiffs, who sought damages and an injunction, had abandoned their damages claim, "the District Court will have no occasion to devote . . . efforts to resolving the question of whether defendants . . . are entitled to qualified immunity.").[27]

_____

[27] As we noted in footnote 15, we do not here decide whether a plaintiff who is successful on a "stigma-plus" due process claim is entitled to damages in addition to or instead of a name-clearing hearing. Assuming for the sake of argument that he is so entitled, Marino would be protected by qualified immunity on Hill's "stigma-plus" claim to the extent that Hill requests damages.

While, as explained above, a violation of a constitutional right may have occurred here, that right was not clearly established in this Circuit before this opinion. Before today, the law in this Circuit had been unclear on the question of whether

We further hold that it is not possible at this juncture to determine whether Marino is entitled to qualified immunity on Hill's First Amendment claim. As explained above, we cannot determine on the basis of the complaint alone whether Hill stated a claim for a constitutional violation; we similarly cannot tell without factual development through discovery whether the right at issue was clearly established. This defense may well lend itself to resolution at summary judgment.

B.

We next address Hill's claims against the Borough of

---

a public employee who was defamed in the process of being discharged may state a "stigma-plus" due process claim, though he lacked a property interest in continued employment. We had referred to this lack of clarity on two occasions. *Graham v. City of Philadelphia*, 402 F.3d 139, 142 n.2 (3d Cir. 2005); *Ersek v. Township of Springfield*, 102 F.3d 79, 83 n.5 (3d Cir. 1997). The lack of clarity was further evident from the fact that district courts within this Circuit had decided the question in both ways. *Compare, e.g., Farber v. City of Paterson*, 327 F.Supp.2d 401, 412 n.14 (D.N.J. 2004) (rev'd on other grounds) *and Graham v. Johnson*, 249 F.Supp.2d 563, 565-568 (E.D.Pa. 2003) (both answering the question "yes") *with Satterfield v. Borough of Schylkill Haven*, 12 F.Supp.2d 423, 433-434 (E.D.Pa. 1998) *and* the district court opinion in this case (both answering the question "no"). For this reason, the question was a question of first impression in this Circuit. No matter what further fact development reveals, then, the law was not clearly established on the point in question, and, if damages were in question, Marino would be entitled to qualified immunity.

38

Kutztown.

### 1. §1983 Claims

Hill brings against the Borough all the §1983 claims he brought against the Mayor. Because we will affirm the dismissal of the claims against the Mayor alleging deprivation of a property right without due process, violation of substantive due process rights and violation of equal protection rights, we dismiss those claims against the Borough as well. "There cannot be an 'award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm.'" *Grazier ex rel. White v. City of Philadelphia,* 328 F.3d 120*,* 124 (3d Cir. 2003) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

We will not, however, affirm the dismissal of Hill's claims against the Borough alleging deprivation of a liberty interest in reputation without due process, and violation of the First Amendment, because Hill has stated these claims against Marino, and Marino was a final policy-maker capable of binding the Borough with his conduct when it came to constructively discharging Hill.

A municipality may not be held liable under §1983 for the constitutional torts of its employees by virtue of *respondeat superior*. Rather, a municipality may be held liable for the conduct of an individual employee or officer only when that conduct implements an official policy or practice. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 (1978); *McGreevy v. Stroup*, 413 F.3d 359,

367 (3d Cir. 2005).

An individual's conduct implements official policy or practice under several types of circumstances, including when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred. *See generally Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-484 (1986)*; McGreevy*, 413 F.3d at 367; *Laverdure v. County of Montgomery*, 324 F.3d 123, 125-126 (3d Cir. 2003).

Here, it is number (2) above that is most relevant. Only if Mayor Marino was a final policy-maker was his constructive discharge of Hill effectively official Borough policy such that the Borough may be held liable for it. Hill has alleged explicitly that Mayor Marino was a final policymaker. *See, e.g.,* ¶¶97, 101, 108, 115.

In order to ascertain if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question, *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) *and City of St. Louis v. Praprotnik*, 485 U.S. 915, 924 (1988), and (2) whether the official's authority to make policy in that area is

40

*final and unreviewable*.  *Praprotnik*, 485 U.S. at 926; *Pembaur*, 475 U.S. at 483; *McGreevy*, 413 F.3d at 369; *Brennan*, 350 F.3d at 428 ("if a municipal employee's decision is subject to review . . . it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under §1983").

Here, Hill alleges that Marino constructively discharged him.  As Hill points out, as a matter of state law, *no* government employee or body *is permitted to* constructively discharge an employee by making his working environment intolerable.  As we discussed, however, Hill has alleged that the Mayor *had the power to* constructively discharge him, though he (Marino) lacked the power as Mayor to fire him outright.  Moreover, Marino's constructive discharge of Hill was final in the sense that it was not reviewable by any other person or any other body or agency in the Borough.  That is, there was no one "above" the Mayor who had the power to curtail his conduct or prevent him from harassing  Hill to the point where Hill had no alternative but to leave his position.[28]  In this sense, Marino was a final policy-maker for the purpose of constructively discharging Hill.

The Borough concedes that as the highest elected official, Mayor Marino may well be a final policymaker in other areas of Borough business.  However, it argues (and the District Court held), that because only the *Borough Council*

---

[28] Indeed, the Borough notes in its brief that the "Borough Council has no more power to silence the mayor than it does to silence a private citizen."  *Brief* at 26.

41

has the power to fire the Borough Manager, it is the *Borough Council* (and not the Mayor) which is the final policy-maker in the area of the Borough Manager's employment. Marino did not, however, fire Hill; rather, through Marino's actions, conduct and harassment, Marino *constructively discharged* Hill. For the reasons discussed above, the Mayor had final policy-making authority to do so.

Hill has alleged that the municipality is bound by Marino's conduct. We agree. *See Bartholomew v. Fischl*, 782 F.2d 1148, 1153 (3d Cir. 1986) (holding that a mayor who, like Marino, did not have the authority to fire a public employee directly, but who, like Marino, effectively fired the employee in an indirect way – by persuading city councils to dissolve the agency he worked for – was "a government official with policy-making powers" for whose wrongful termination of the public employee the city was liable).

## 2. ADEA Claim

Hill claims that Mayor Marino constructively discharged him because of his age, and that this constitutes an ADEA violation for which the Borough should be held liable.[29] The ADEA provides, in pertinent part,

---

[29] Hill did not bring an ADEA claim against Mayor Marino himself, nor could he have because the ADEA does not provide for individual liability. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37,* 260 F.3d 602, 610 n.2 (7th Cir. 2001); *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674 (5th Cir. 2001); *Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995) (all holding that there is no individual liability under the ADEA).

It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.

29 U.S.C. §623(a).

Once again, the District Court dismissed Hill's age discrimination claim against the Borough on the ground that Marino could not constructively discharge Hill because he lacked the power to fire him, so the Borough could not be held liable for such a discharge. The District Court also noted that the Borough lacked the authority to control what Marino, the "independently elected mayor," did and said, and thus could not be held responsible for his conduct, especially where members of the Borough Council had supported Hill.

We have already (in the context of Hill's First Amendment claims) explained why Marino *could*, in fact, constructively discharge Hill. The Borough may be held liable for the alleged discharge because a plaintiff may bring an ADEA claim against a political subdivision of a state[30]

_____

*See also Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 184 (3d Cir. 1997) (holding that Congress did not intend to hold individual employees liable under Title VII, which is parallel to the ADEA in many ways).

[30] The ADEA includes in its definition of employer "a State or political subdivision of a State." 29 U.S.C. §630(b)(2). The Supreme Court held in *Kimel v. Florida Bd. of Regents*, 528

43

based on the actions of its employee(s).[31] It does not matter that one entity within the Borough (the Council) may have supported Hill; the Council's alleged support of Hill does not "counteract" nor cure the Mayor's alleged harassment, with the result of immunizing the Borough of Kutztown from

_____

U.S. 62 (2000) that in the ADEA, Congress did not validly abrogate the *states*' sovereign immunity to suits by private individuals. It does not follow, however, that sovereign immunity protects *political subdivisions of states* from suit by individuals. *See, e.g., Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) ("the Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'").

[31] *See, e.g., Fasold v. Justice,* 409 F.3d 178 (3d Cir. 2005) (terminated former detective in the office of the District Attorney in Montgomery County, Pennsylvania brought ADEA claims against several defendants including Montgomery County, Pennsylvania); *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366 (3d Cir. 2004) (unsuccessful applicant for plumbing/HVAC instructor brought ADEA claim against school district); *Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323 (3d Cir. 2000) (unsuccessful applicant for teaching positions brought ADEA claim against school district); *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000) (Sanitation Inspector who drew a smaller salary than his younger colleagues brought ADEA claim against several defendants including the County of Monmouth and the Monmouth County Board of Health); *Smith v. Borough of Wilkinsburg*, 147 F.3d 272 (3d Cir. 1998) (former borough manager whose contract was not renewed brought ADEA claim against defendant borough).

liability.

To state a claim for age discrimination under the ADEA, a plaintiff must allege that (1) he is over forty, (2) he is qualified for the position in question, (3) he suffered from an adverse employment decision,[32] and (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination. *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004).

Hill's allegations satisfy these requirements. *See* ¶127. Among other things, Hill was over forty when he was discharged, and his replacement was 27. Hill has therefore stated an ADEA claim that survives dismissal under 12(b)(6). The same legal standard applies to a claim under the PHRA as applies to an ADEA claim. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 n.1 (3d Cir. 2005).

IV.

We will affirm the District Court's dismissal of Hill's §1983 procedural due process (property interest) claims against Marino and the Borough, his §1983 substantive due process claims against Marino and the Borough, his §1983 equal protection claims against Marino and the Borough, and his §1983 First Amendment retaliation claims against Marino and the Borough insofar as they are premised on Hill's report to the Borough Council, and Hill's support for "the policies

---

[32] Constructive discharge is an adverse employment decision that may form the basis of an ADEA claim. *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001).

and programs of the previous mayor."   We will also affirm the dismissal of Hill's §1983 "stigma-plus" due process claim against Marino to the extent that claim seeks damages because Marino is entitled to qualified immunity on that claim.

We will reverse the District Court's dismissal of  Hill's §1983 "stigma-plus" due process claim against Marino to the extent that claim seeks a name clearing hearing, Hill's §1983 "stigma-plus" due process claim against the Borough, and Hill's §1983 First Amendment retaliation claims against Marino and the Borough, insofar as they are premised on Hill's support for ideas, principles and projects that Marino disfavored, including the telecommunications project.  We will also reverse the District Court's dismissal of Hill's ADEA and PHRA claims against the Borough.

We will remand for further proceedings consistent with this opinion.  On remand, the District Court will have to address the state claims over which it declined to exercise jurisdiction.